No. 14-15031

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————————

UNITED STATES ex rel. ADAMS, *et al.*,

Plaintiffs-Appellants,

v.

AURORA LOAN SERVICES, INC., *et al.*,

Defendants-Appellees.

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA

———————————

**BRIEF FOR THE UNITED STATES OF AMERICA AS AMICUS CURIAE IN
SUPPORT OF NEITHER PARTY**

———————————

STUART F. DELERY
  *Assistant Attorney General*

DANIEL G. BOGDEN
  *United States Attorney*

MICHAEL S. RAAB
MELISSA N. PATTERSON
  *(202) 514-1201*
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7230*
  *U.S. Department of Justice*
  *950 Pennsylvania Ave., N.W.*
  *Washington, D.C.  20530*

# TABLE OF CONTENTS

**Page**

INTEREST OF THE UNITED STATES ................................................................1

STATEMENT OF FACTS ....................................................................................2

    A.    THE FALSE CLAIMS ACT ......................................................2

    B.    FACTUAL BACKGROUND.......................................................5

    C.    PROCEEDINGS IN THIS CASE ................................................7

SUMMARY OF ARGUMENT ...........................................................................10

ARGUMENT .......................................................................................................13

I.    THE DISTRICT COURT IMPROPERLY CONFLATED THE FCA'S TWO
DEFINITIONS OF "CLAIM." ..........................................................................13

    A.    The GSEs Are Not Part Of The Federal
Government ...........................................................................13

    B.    A "Claim" Under The FCA Need Not Be Made
Directly To The Government ...............................................16

II.    THE FALSE CLAIMS ACT MAY EXTEND TO CLAIMS MADE
ON THE GSEs...................................................................................19

    A.    A Request Or Demand To A "Contractor, Grantee,
Or Other Recipient" ............................................................21

i

B.      Money Or Property "Spent Or Used On The
        Government's Behalf Or To Advance A
        Government Program Or Interest" ....................................23

C.      Government Provision Of "Any Portion Of
        The Money Or Property Which Is Requested
        Or Demanded" .....................................................................26

CONCLUSION...........................................................................................31

CERTIFICATE OF COMPLIANCE WITH
FEDERAL RULE OF APPELLATE PROCEDURE 32(A)

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**

*Allison Engine Co., Inc.* v. *United States ex rel. Sanders,*
   553 U.S. 662 (2008) ........................................................................5

*Am. Bankers Mortg. Corp.* v. *Fed. Home Loan Mortg. Corp.,*
   75 F.3d 1401 (9th Cir. 1996)........................................................15

*Garg* v. *Covanta Holding Corp.,*
   478 F. App'x 736 (3d Cir. 2012) ............................................. 29, 30

*Lebron* v. *Nat'l R.R. Passenger Corp.,*
   513 U.S. 374 (1995) ................................................................ 14, 15

*Mik* v. *Fed. Home Loan Mortg. Corp.,*
   743 F.3d 149 (6th Cir. 2014)........................................................15

*Narra* v. *Fannie Mae,*
   No. 2:13-cv-12282, 2014 WL 505571 (E.D. Mich. Feb. 7, 2014)............. 15, 16

*United States ex rel. DRC, Inc.* v. *Custer Battles, LLC,*
   562 F.3d 295 (4th Cir. 2009)........................................................27

*United States ex rel. Totten* v. *Bombardier Corp.,*
   380 F.3d 488 (D.C. Cir. 2004) ......................................................18

*United States ex rel. Yesudian* v. *Howard University,*
   153 F.3d 731 (D.C. Cir. 1998) ......................................................28

*Vermont Agency of Natural Resources* v. *United States ex rel. Stevens,*
   529 U.S. 765 (2000) .......................................................................2

**Statutes:**

12 U.S.C. § 1451 *et seq.* ....................................................................6

12 U.S.C. § 1455(l) .......................................................................7, 24

12 U.S.C. § 1716b .............................................................................6

12 U.S.C. § 1719(g) ...................................................................7, 23, 24

12 U.S.C. § 4501 ..............................................................................25

12 U.S.C. § 4511(b)(2) .......................................................................6

12 U.S.C. § 4617(a)(2) ....................................................................6, 24

12 U.S.C. § 4617(i)(1)(A) ...................................................................14

12 U.S.C. § 4617(i)(10) .....................................................................13

12 U.S.C. § 4617(i)(10)(B) .................................................................17

31 U.S.C. §§ 3729 *et seq.* ..................................................................1

31 U.S.C. § 3729(a) ...........................................................................5

31 U.S.C. § 3729(a)(1) ......................................................................2

31 U.S.C. § 3729(a)(1)(A) ..................................................................3

31 U.S.C. § 3729(a)(1)(B) ..................................................................3

31 U.S.C. § 3729(a)(2) (2008) ............................................................5

31 U.S.C. § 3729(b)(2)(A) ................................................................27

31 U.S.C. § 3729(b)(2)(A)-(A)(i) ...................................................17

31 U.S.C. § 3729(b)(2)(A)-(A)(ii)(II).............................................17

31 U.S.C. § 3729(b)(2)(A)(i) ....................................................... *passim*

31 U.S.C. § 3729(b)(2)(A)(ii) ...................................................... *passim*

31 U.S.C. § 3729(b)(2)(B) ........................................................4, 27

31 U.S.C. § 3729(c) (2008) ..........................................................27

31 U.S.C. § 3730(a)........................................................................2

31 U.S.C. § 3730(b)(1) .................................................................2

31 U.S.C. § 3730(b)(2) ..................................................................3

31 U.S.C. § 3730(c)(3) ...................................................................3

31 U.S.C. § 3730(d) .......................................................................3

Pub. L. No. 90-448, Title VIII (1968)............................................ 6

Pub. L. No. 91-351, Titles II and III (1970) .................................. 6

Pub. L. No. 110-289, 122 Stat. 2654 (2008).................................. 6

Pub. L. No. 111-21, 123 Stat. 1617 (2009)..................................... 5

**Rules:**

Fed. R. Civ. P. 12(b)(6) ............................................................ 2, 9, 12, 20

**Other Authorities:**

155 Cong. Rec. H5260-01 ...................................................................... 22

155 Cong. Rec. H5686-01 ...................................................................... 23

155 Cong. Rec. S1679-01 ....................................................................... 22

FHFA, *Amended and Restated Senior Preferred Stock Purchase Agreement,* May 6, 2009, available at http://www.fhfa.gov/ Conservatorship/Documents/Senior-Preferred-Stock-Agree/ 2009-5-6_SPSPA_FannieMae_Amendment_508.pdf ................................. 28

FHFA, *Amendment to Amended and Restated Senior Preferred Stock Purchase Agreement,* May 6, 2009, available at http://www.fhfa. gov/Conservatorship/Documents/Senior-Preferred-Stock-Agree/ 2009-5-6_SPSPA_FannieMae_Amendment_508.pdf ................................. 29

FHFA, *Data as of May 8, 2014 on Treasure and Federal Reserve Purchase Programs for GSE and Mortgage-Related Securities,* available at http://www.fhfa.gov/DataTools/Documents/Market- Data/TSYSupport-2014-05-18.pdf ........................................................ 7, 21, 22

FHFA, *Mortgage Market Note 08-4, U.S. Treasury Support for Fannie Mae and Freddie Mac* (Dec. 5, 2008), available at http://www.fhfa.gov/Policy/ProgramsResearch/Research/ PaperDocuments/20081205_MMNote_08-4N508.pdf ................................. 25

FHFA, *Second Amendment to Amended and Restated Senior Preferred Stock Purchase Agreement,* May 6, 2009, available at http://www.fhfa. gov/Conservatorship/Documents/Senior-Preferred-Stock-Agree/ 2009-5-6_SPSPA_FannieMae_Amendment_508.pdf................................. 29

S. Rep. No. 111-10 (2009) .............................................................. 5, 18

*Statement of FHFA Director James B. Lockhart,* September 7, 2008 (Docket # 165-1) . .................................. 6, 24, 25

*Statement of Secretary Henry M. Paulson, Jr. on Treasury and Federal Housing Finance Agency Action to Protect Financial Markets and Taxpayers,* Sept. 7, 2008 (Docket # 165-2)............. 7, 25

U.S. Treasury, *Fact Sheet: Treasury Senior Preferred Stock Purchase Agreement* (Sept. 7, 2008), available at http://www.fhfa.gov/ Policy/ProgramsResearch/Research/PaperDocuments/ 20081205_MMNote_08-4N508.pdf................................................. 25

## INTEREST OF THE UNITED STATES

This case involves allegations that defendants are liable under the False Claims Act (FCA), 31 U.S.C. §§ 3729 *et seq.*, based on their dealings with two government-sponsored entities, the Federal Home Loan Mortgage Corporation (Freddie Mac) and Federal National Mortgage Association (Fannie Mae). The district court dismissed relators' complaints, concluding that they had failed to state a claim under the FCA. The court indicated that claims made to Freddie Mac and Fannie Mae could never be "claims" within the FCA's definition of that term. That reasoning is mistaken, and, if it were adopted by this Court, the government's enforcement of the FCA could be significantly impaired.

The United States has a strong interest in ensuring the proper interpretation of the FCA, which is the government's primary tool to combat fraud and recover losses due to fraud in federal programs. Relators do not rely on the FCA's definition of "claim" under 31 U.S.C. § 3729(b)(2)(A)(ii) in their opening brief, and they therefore may have waived any argument concerning that provision. Moreover, the United

States takes no position on whether relators' complaint alleged facts sufficient to state a claim under Federal Rule of Civil Procedure 12(b)(6). However, should this Court find it necessary to address the scope of section 3729(b)(2)(A)(ii), it should make clear that claims against Freddie Mac and Fannie Mae may give rise to FCA liability.

## STATEMENT OF FACTS

### A.     THE FALSE CLAIMS ACT

The False Claims Act prohibits the submission of false or fraudulent claims for payment to the United States or the making of false statements for the purpose of causing a false claim to be paid.  A person who violates the FCA is liable to the United States for civil penalties and for three times the amount of the government's damages.  31 U.S.C. § 3729(a)(1).  Suits to collect statutory damages and penalties may be brought either by the Attorney General of the United States, or by a private person (known as a relator) in the name of the United States, in an action commonly referred to as a *qui tam* suit.  31 U.S.C. § 3730(a) and (b)(1); *see also Vermont Agency of Natural Resources* v. *United States ex rel. Stevens*, 529 U.S. 765, 769-78 (2000).

2

When a *qui tam* action is filed, the government may intervene and take over the case "within 60 days after it receives both the complaint and the material evidence and information," 31 U.S.C. § 3730(b)(2), or "at a later date upon a showing of good cause," 31 U.S.C. § 3730(c)(3). If the government declines to intervene, the relator conducts the litigation, and if a *qui tam* suit results in a recovery, those proceeds are divided between the government and the relator. 31 U.S.C. § 3730(d).

A violation of the FCA occurs when a person "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A), (B). One definition of "claim" under the Act is "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that . . . is presented to an officer, employee, or agent of the United States." *Id.* § 3729(b)(2)(A)(i). However, a request or demand not

3

directly presented to the government may also be a "claim" under the FCA.

The Act also defines that term as:

> [A]ny request or demand, whether under a contract or otherwise, for money or property *and whether or not the United States has title to the money or property*, that . . . is made to a contractor, grantee, or other recipient, *if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—(I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded*.

31 U.S.C. § 3729(b)(2)(A)(ii).  The Act specifically excludes from the

definition of "claim" only "requests or demands for money or property

that the Government has paid to an individual as compensation for Federal

employment or as an income subsidy with no restrictions on that

individual's use of the money or property."  *Id.* § 3729(b)(2)(B).  The

italicized language above was added in 2009 when Congress amended the

FCA in the Fraud Enforcement and Recovery Act of 2009 (FERA), Pub. L.

No. 111-21, 123 Stat. 1617.[1]

### B.    FACTUAL BACKGROUND

Freddie Mac and Fannie Mae are "government sponsored

enterprises" (GSEs), private corporations established by Congress to

facilitate home ownership through the provision and development of

---

[1] FERA also changed section 3729(a) to include the materiality language quoted above, altering that section's previous imposition of liability on anyone who used "a false record or statement *to get* a false or fraudulent claim paid or approved by the Government," as well as on anyone who presented a false claim "to an officer or employee of the United States Government" directly.  31 U.S.C. § 3729(a)(2) (2008) (emphasis added).  The Supreme Court concluded in 2008 that this language required an FCA plaintiff to show that a defendant intended the government itself pay the claim, not just that government funds were actually used to pay a false or fraudulent claim.  *See Allison Engine Co., Inc.* v. *United States ex rel. Sanders*, 553 U.S. 662 (2008).  FERA's legislative history indicates that Congress amended the FCA to override that interpretation.  Congress considered the Supreme Court's interpretation in *Allison Engine* to be "contrary to Congress's intent," since, under that interpretation, "even when a subcontractor in a large Government contract knowingly submits a false claim to [a] general contractor and gets paid with Government funds, there can be no liability unless the subcontractor intended to defraud the Federal Government, not just their general contractor."  S. Rep. No. 111-10 at 10-12 (2009), *reprinted in* 2009 U.S.C.C.A.N. 430, 438.

secondary markets for conventional mortgages. *See* Housing and Urban Development Act of 1968, Pub. L. No. 90-448, Title VIII (Aug. 1, 1968) (establishing Fannie Mae as a "Government-sponsored private corporation"), codified at 12 U.S.C. § 1716b; Emergency Home Finance Act of 1970, Pub. L. No. 91-351, Titles II and III (July 24, 1970) (authorizing Fannie Mae to provide a secondary market for conventional mortgages and establishing Freddie Mac for similar purposes), Freddie Mac provisions codified at 12 U.S.C. § 1451 *et seq*.

In 2008, Congress enacted the Housing and Economic Recovery Act of 2008 (HERA), Pub. L. No. 110-289, 122 Stat. 2654, which, among other things, established the Federal Housing Finance Agency (FHFA) to provide oversight of the GSEs. HERA, § 1311(b)(2), codified at 12 U.S.C. § 4511(b)(2). Shortly thereafter, on September 7, 2008, the agency exercised its statutory authority to place the GSEs into FHFA-administered conservatorships. *See* 12 U.S.C. § 4617(a)(2) (authorizing Director of FHFA to be appointed GSEs' conservator); Docket # 165, Exhibit 1 (Statement of FHFA Director James B. Lockhart (Sept. 7, 2008)). The Treasury

Department exercised its authority under HERA to enter into preferred

stock purchase agreements with the GSEs through their conservator, as

well as taking other measures to maintain and fund the GSEs' continuing

operations.  *See* 12 U.S.C. § 1719(g) (Treasury authority to purchase

securities in Fannie Mae); 12 U.S.C. § 1455(l) (same, Freddie Mac); Docket

# 165, Exhibit 2 (Treasury Department Press Release (Sept. 7, 2008)).  By

2012, Fannie Mae had received over $116 billion, and Freddie Mac $71

billion, of Treasury funds under the agreements with the Treasury

Department.  *See Data as of May 8, 2014 on Treasury and Federal Reserve*

*Purchase Programs for GSE and Mortgage-Related Securities* (GSE Draw Table)

at 2, available at http://www.fhfa.gov/DataTools/Documents/Market-

Data/TSYSupport-2014-05-08.pdf.

### C.    PROCEEDINGS IN THIS CASE

1.  Relators brought suit under the False Claims Act against

numerous financial institutions, including entities associated with all major

servicers of residential mortgages, multiple debt collection agencies, and

many homeowner associations in Nevada.  *See* Third Amended Complaint

(Complaint), Docket # 43, Case No. 2:11-cv-00535 (D. Nev.); ER319-339.[2]

Relators alleged that defendants sold mortgages to, or performed loan

servicing functions on behalf of, Freddie Mac and Fannie Mae.  Complaint

¶ 36; ER325.  Relators allege that defendants violated the False Claims Act

by falsely certifying compliance with various contractual obligations in

order to cause the GSEs to pay defendants to maintain properties and to

improperly cover or reimburse homeowner association fees and costs.  *See*

*generally* Complaint ¶¶ 37-108; ER325-338.

Defendants filed a motion to dismiss, arguing that relators had failed

to state a claim because the FCA does not apply to transactions involving

the GSEs.  Docket # 100-1 at 24-40; ER262-278.  Defendants argued that

relators' allegations were insufficient to establish presentment directly to

the government under section 3729(b)(2)(A)(i) since the GSEs are not part

of the federal government.  Defendants further argued that the allegations

---

[2] As the district court noted, the last amendment was the third
amended complaint, although this document is incorrectly labeled the
"Second Amended Complaint."  District Court Order, Docket # 171 at 3 n.1;
ER17.

failed to satisfy the requirements of section 3729(b)(2)(A)(ii) because

relators pleaded no facts in support of a theory that the GSEs' payments to

defendants were spent "on the Government's behalf or to advance a

Government program or interest" and that the government provided or

reimbursed "any portion of the money or property requested or

demanded."  31 U.S.C. § 3729(b)(2)(A)(ii); Docket # 100-1 at 27-29; ER265-

67.

The United States filed a statement of interest in the district court to

elucidate the "narrow issue" of whether the FCA as amended by FERA

could ever apply to claims made on Fannie Mae and Freddie Mac after they

were placed into federal conservatorship and received billions of dollars

from the Treasury Department to fund their continuing operations.  *See*

U.S. Statement of Interest (Statement), Docket # 165 at 2 & 5 n.3; ER51-58.

The government took no position as to whether relators had alleged facts

sufficient to state a claim.

2.  The district court granted defendants' motion to dismiss for failure

to state a claim under Federal Rule of Civil Procedure 12(b)(6).  *See* District

9

Court Order (Op.), Docket # 171; ER15-29.  With respect to defendants'
argument that relators failed to state a claim, the court concluded that the
GSEs are not part of the United States government, and that the statute
authorizing the GSEs' conservatorship did not alter that status.  *Id.* at 11-12;
ER25-26.  The court further determined that "the United States' majority
ownership of the GSE stock does not change the result," since under
corporate law principles, "[t]he property of a corporation is not the
property of its shareholders."  *Id.* at 12; ER26.  The court rejected relators'
argument that the GSEs were "federal instrumentalities" for FCA purposes.
*Id.* at 12-14; ER26-28.  Without further analysis, the district court also
asserted that a false claim to the GSEs is not a request or demand to the
United States or to a contractor, grantee, or other recipient falling within 31
U.S.C. § 3729(b)(2)(A)(ii).  *Id.* at 14; ER28.

## SUMMARY OF ARGUMENT

As amended in 2009, the False Claims Act includes two definitions of
the sort of "claim" that may give rise to liability under the statute.  The first
definition, in 31 U.S.C. § 3729(b)(2)(A)(i), requires that a demand or request

be made upon the government.  The second definition, in 31 U.S.C.

§ 3729(b)(2)(A)(ii), does not.  Instead, it defines a "claim" as a request or

demand made upon non-governmental third parties under certain

conditions.  Congress added this definition of "claim" in 2009, after

concluding that several courts had inappropriately constricted the scope of

FCA liability in cases where fraud upon third-party recipients of federal

funds was resulting in loss to the government.

The district court improperly conflated these two statutory

definitions.  After analyzing whether the GSEs are part of the federal

government—and correctly concluding that they are not—the district court

indicated that this analysis defeated any argument that a claim made upon

the GSEs could be a "claim" under section 3729(b)(2)(A)(ii) as well as

section 3729(b)(2)(A)(i).  That was error.

Relators do not argue on appeal that claims upon the GSEs meet the

statutory criteria of claims under section 3729(b)(2)(A)(ii) and thus may

have waived that issue.  Moreover, the government takes no position on

whether the complaint in this case pleaded facts sufficient to state an FCA

11

claim under Rule 12(b)(6).  However, to the extent that the Court addresses the scope of section 3729(b)(2)(A)(ii), it should clarify that the GSEs are not excluded from FCA liability under this provision.  Requests or demands made upon the GSEs—as on any third party entity—may meet the Act's definition of "claim" under 31 U.S.C. § 3729(b)(2)(A)(ii).  That provision defines "claim" as a request or demand made upon:  (1) a "contractor, grantee, or other recipient"; (2) where "the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest"; and (3) the government is providing or reimbursing "any portion of the money or property requested or demanded."  Indeed, the district court's conclusion on this score is particularly anomalous because during the time period relevant to relators' complaint, the GSEs received billions of dollars in federal funds, underscoring the possibility that a plaintiff could, in an appropriate case, state a claim under the FCA based on fraud on the GSEs.

# ARGUMENT

## I.   THE DISTRICT COURT IMPROPERLY CONFLATED THE FCA'S TWO DEFINITIONS OF "CLAIM."

The district court analyzed only one of the two definitions of "claim" in the FCA as amended by FERA, and then appears to have extended that analysis to both definitions.  In this respect, the district court erred.

### A.   The GSEs Are Not Part Of The Federal Government.

The district court's analysis regarding defendants' motion to dismiss for failure to state a claim focused entirely on whether the GSEs became part of the United States government by virtue of the FHFA conservatorship or the preferred stock purchase agreements with Treasury. Based on this analysis, the district court correctly concluded that these events did not render the GSEs part of the government.  *See* Op. 11-12; ER25-26.[3]  As conservator, the FHFA stands in the shoes of the GSEs, which

---

[3] Although the district court's conclusion on this score is correct, its reliance on 12 U.S.C. § 4617(i)(10)—which provides that "[a] limited-life regulated entity is not an agency, establishment, or instrumentality of the United States," and that employees of such an entity are not "officers or employees of the United States"—is not.  These provisions apply only where a "limited-life regulated entity" is established, which occurs only in

*Continued on next page.*

13

remain private corporations.  And the district court correctly concluded

that Treasury's stock purchases did not transform the GSEs into

governmental entities.  *See* Op. 12; ER26 (reasoning that a corporation and

its shareholders are separate legal entities under principles of corporate

law).  Because the GSEs are not part of the federal government, the district

court correctly concluded that claims made upon the GSEs do not fall

within the first definition of "claim" set out in the amended FCA, which

requires a request or demand be "presented to an officer, employee, or

agent of the United States."  31 U.S.C. § 3729(b)(2)(A)(i).

In their opening brief, relators argue that the GSEs are government

actors under *Lebron* v. *Nat'l R.R. Passenger Corp.*, 513 U.S. 374 (1995); *see* Br.

17-23.  Relators' reliance on *Lebron* is misplaced, since that case applies only

to cases involving constitutional, not statutory, claims against government-

sponsored corporations.  *See id.* at 392 (distinguishing between "Amtrak's

status as a Government entity for purposes of [statutory] matters that are

---

connection with receiverships, not conservatorships.  *See* 12 U.S.C.
§ 4617(i)(1)(A).

within Congress's control" and "Amtrak's status as a Government entity

for purposes of determining the constitutional rights of citizens affected by

its actions"); *Am. Bankers Mortg. Corp.* v. *Fed. Home Loan Mortg. Corp.*, 75

F.3d 1401, 1406-09 (9th Cir. 1996) (applying *Lebron* to determine if Freddie

Mac was a government actor for purposes of a constitutional claim); *Mik* v.

*Fed. Home Loan Mortg. Corp.*, 743 F.3d 149, 168 (6th Cir. 2014) ("In *Lebron*,

the Supreme Court established a framework for determining when a

government-sponsored corporation is a government actor for constitutional

purposes.") (citation omitted).  Thus, *Lebron* does not govern whether the

GSEs are properly deemed part of the United States for FCA purposes.[4]

---

[4] Even if *Lebron* were relevant to the GSEs' governmental status under the FCA, relators' assertion that the GSEs are government actors under *Lebron* is incorrect.  *See* Br. 21.  In *Lebron*, the Supreme Court concluded that Amtrak was part of the government for First Amendment purposes because the federal government "retain[ed] for itself *permanent authority* to appoint a majority of the directors of that corporation," thereby guaranteeing permanent control over the entity.  513 U.S. at 400 (emphasis added).  Federal courts around the country have concluded that FHFA's conservatorship does not constitute permanent government control within the meaning of *Lebron* and that the GSEs therefore are not "government actors" subject to constitutional claims.  *See, e.g., Mik*, 743 F.3d at 168; *Narra* v. *Fannie Mae*, No. 2:13-cv-12282, 2014 WL 505571, at *4 (E.D. Mich. Feb. 7,

*Continued on next page.*

## B.     A "Claim" Under The FCA Need Not Be Made Directly To The Government.

The district court's analysis regarding the GSEs' non-governmental

status does not address—let alone resolve—whether claims made upon the

GSEs could fall within the *second* definition of "claim" in the amended

FCA.  That definition, in 31 U.S.C. § 3729(b)(2)(A)(ii), does not require that

a claim be made directly to the government.[5]  Section 3729(b)(2)(A)(ii)

makes clear that liability may exist when a claim is made upon a private

entity that is a "contractor, grantee, or other recipient" of federal funds,

provided that the requested "money or property is to be spent or used on

the Government's behalf or to advance a Government program or interest,"

and the government will provide or reimburse to the private entity "any

_____

2014) ("Federal courts . . . have comprehensively examined the issue and
found that neither Fannie Mae nor Freddie Mac are governmental actors
post-conservatorship pursuant to the Supreme Court's decision in *Lebron*")
(collecting cases).

[5] Under either definition of "claim," the FCA makes clear that liability
may arise "whether or not the United States has title to the money or
property" demanded or requested.  31 U.S.C. § 3729(b)(2)(A).

portion of the money or property requested or demanded." *Id.*

§ 3729(b)(2)(A)(ii).

Despite the differences in the requirements of sections

3729(b)(2)(A)(i) and (ii), the district court indicated without explanation

that its reasoning regarding the GSEs' governmental status also precluded

relators from stating a claim under section 3729(b)(2)(A)(ii):

> The GSE are therefore not instrumentalities of the United
> States, and an alleged attempt to defraud them is not an alleged
> attempt to assert a false claim against the United States under
> the FCA. A false claim against Fannie Mae or Freddie Mac is
> neither a "request or demand . . . for money or property . . .
> presented to an officer, employee, or agent of the United
> States," see 31 U.S.C. § 3729(b)(2)(A)–(A)(i); 12 U.S.C.
> § 4617(i)(10)(B), *nor a "request or demand . . . for money or property
> . . . made to a contractor, grantee, or other recipient, . . . [where] the
> United States Government . . . has provided any portion of the money
> or property requested or demanded," see 31 U.S.C. § 3729(b)(2)(A)–
> (A)(ii)(II).* Relators have therefore failed to state a claim.

Op. 14 (emphasis added); ER14.  That improperly conflates section

3729(b)(2)(A)(i), which addresses claim presentment directly to the

government, and section 3729(b)(2)(A)(ii), which addresses claim

presentment to private entities that nonetheless ultimately results in loss to

the government.

The error of the district court's approach is illustrated by its reliance on *United States ex rel. Totten* v. *Bombardier Corp.*, 380 F.3d 488 (D.C. Cir. 2004), in reaching its conclusion under both sections 3729(b)(2)(A)(i) and (ii).  *See* Op. 13-14; ER27-28.  In *Totten*, the D.C. Circuit concluded that fraudulent claims made upon Amtrak could not give rise to liability under the pre-FERA version of the False Claims Act, despite Amtrak's status as a federal grantee, because the claims were not presented directly to the United States.  *See Totten*, 380 F.3d at 492-93.  FERA's legislative history specifically identifies *Totten* as a case that Congress considered to set forth an erroneous interpretation of the statute and which Congress was attempting to "correct and clarify" by amending the FCA.  *See* S. Rep. No. 111-10 at 10-11.   The district court's invocation of *Totten's* conclusion that Amtrak cannot be a "relatee for the purposes of an FCA claim," Op. 13-14, ER27-28, wholly ignores the import of FERA's 2009 amendments, which expanded the definition of "claim" in  31 U.S.C. § 3729(b)(2)(A)(ii) precisely to avoid the result reached in cases like *Totten*.

18

The district court's conflation of the two distinct statutory definitions of "claim" contradicts the text of the statute and would significantly hamper the United States' ability to invoke the FCA to protect government funds channeled through third parties to advance government purposes and programs. Thus, if this Court addresses the issue, it should make clear that section 3729(b)(2)(A)(ii)'s definition of "claim" cannot be conflated with section 3729(b)(2)(A)(i)'s, and that the former does not require that a request or demand be made upon a government entity in order to give rise to liability under the FCA.

## II.    THE FALSE CLAIMS ACT MAY EXTEND TO CLAIMS MADE ON THE GSEs.

Relators refer to portions of the definition of "claim" under 31 U.S.C. § 3729(b)(2)(A)(ii) only fleetingly in their opening brief, and do not offer any argument as to why claims upon the GSEs meet that provision's criteria. *See* Br. 5, 24. Thus, this Court might conclude that relators have waived this issue. Furthermore, the government takes no position on whether the allegations in the relators' complaint—which does not detail factual allegations in support of a theory that 31 U.S.C. § 3729(b)(2)(A)(ii)'s

requirements are satisfied here—were adequate to state a claim under Rule 12(b)(6).

To the extent that this Court finds it necessary to address the scope of section 3729(b)(2)(A)(ii) in this case, however, it should make clear that the claims made upon the GSEs may give rise to FCA liability. As discussed above, 31 U.S.C. § 3729(b)(2)(A)(ii)'s definition of "claim" provides that a claim need not be presented to a governmental entity in order to give rise to FCA liability. Just as the FCA may extend to false requests or demands that meet the statutory conditions made upon any nongovernmental third party, such requests or demands made upon the GSEs may give rise to liability; the district court erred in indicating otherwise. Indeed, the district court's apparently categorical exclusion of "false claim[s] against Fannie Mae or Freddie Mac" from the definition of "claims" under section 3729(b)(2)(A)(ii) is particularly anomalous because of the ways in which these GSEs were operating due to their receipt of extraordinary sums of government money during the period relevant to relators' allegations.

Under the amended statute, an FCA plaintiff who wishes to make out a case based on claims presented to a third party must show:  (1) that the defendant made a request or demand to a "contractor, grantee, or other recipient"; (2) that the money or property demanded "is to be spent or used on the Government's behalf or to advance a Government program or interest"; and (3) that "the United States Government—(I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded."  31 U.S.C. § 3729(b)(2)(A)(ii).  The government funding received by the GSEs since 2008 underscores the possibility that an FCA plaintiff could establish that claims upon the GSEs meet these requirements.

## A.    A Request Or Demand To A "Contractor, Grantee, Or Other Recipient"

There can be no dispute that a plaintiff could establish that the GSEs meet the first statutory criterion.  By 2012, Fannie Mae had received over $116 billion, and Freddie Mac $71 billion, of Treasury funds under the preferred stock purchase agreements with Treasury.  *See* GSE Draw Table

21

at 2.  Whether or not the GSEs' acceptance of Treasury funds in exchange for stock in accordance with legally binding contracts would render them "contractors" or "grantees," it certainly renders them "other recipients."[6] Indeed, the capacious phrase "other recipient" suggests a congressional intent to cast a broad net, a reading supported by legislators' statements before FERA's passage that the amendments were designed to redress fraud with respect to government funds expended as part of the economic recovery efforts.  *See, e.g.*, 155 Cong. Rec. S1679-01, 2009 WL 275706 (Sen. Leahy, introducing the bill) (criticizing court decisions "which limit the scope of the law and allow sub-contractors paid with government money to escape responsibility for proven frauds" and urging quick clarification of the FCA "in order to protect from fraud the Federal assistance and relief funds expended in response to our current economic crisis").[7]  Thus, a

---

[6] The FCA does not define "contractor" or limit the types of contracts that place a third party within the scope of this term.

[7] *See also* 155 Cong. Rec. H5260-01, 2009 WL 1228046 (Rep. Sensenbrenner) (noting FERA's improvements to the FCA specifically, and noting that "[w]ith the U.S. Government relying on private contractors to

*Continued on next page.*

plaintiff could certainly establish that the GSEs were, as of 2008,

"contractor[s], grantee[s], or other recipient[s]" of federal funds.

### B.     Money Or Property "Spent Or Used On The Government's Behalf Or To Advance A Government Program Or Interest"

A plaintiff could also establish that a false claim made upon the GSEs

was for "money or property . . . to be spent or used on the Government's

behalf or to advance a Government program or interest." 31 U.S.C.

§ 3729(b)(2)(A)(ii). The enormous investment authorized by Congress to

rescue the GSEs from anticipated failure, as well as the statutory authority

granted to and used by the FHFA to place the GSEs in conservatorship,

indicate that Congress considers these entities to be serving critical

governmental interests. *See* 12 U.S.C. § 1719(g) (Treasury authority to

_____

disburse funds for everything from our Medicare prescription drug
program to our war efforts in Iraq to the stimulus money, billions of
Federal dollars are now in jeopardy" and that "[t]he bailouts that Congress
is approving left and right, without proper transparency or accountability,
only adds to the amount of government funds in jeopardy from the
fraudsters"); 155 Cong. Rec. H5686-01, 2009 WL 1373400 (Rep. Scott)
(stating that "the Fraud Enforcement and Recovery Act of 2009[] is a bill
crafted to combat the financial fraud that contributed to causing, and
worsening, our Nation's mortgage crisis").

purchase securities in Fannie Mae); 12 U.S.C. § 1455(l) (same, Freddie Mac); 12 U.S.C. § 4617(a)(2) (authorizing Director of FHFA to be appointed GSEs' conservator).  Indeed, Congress made clear that the Treasury Department's temporary, unlimited ability to purchase any obligations and other securities issued by the GSEs "on such terms and conditions as the Secretary may determine and in such amounts as the Secretary may determine" is contingent upon the Secretary making an "[e]mergency determination" that such actions "are necessary to—(i) provide stability to the financial markets; (ii) prevent disruptions in the availability of mortgage finance; and (iii) protect the taxpayer."  12 U.S.C. §§ 1719(g) (Fannie Mae), 1455(l) (Freddie Mac).  FHFA and Treasury Department statements also make clear that the preferred stock purchase agreements were entered into for the purpose of restoring investor confidence and preventing a larger collapse of the U.S. mortgage market and financial system more generally.[8]  Moreover, Congress' creation of the GSEs further

---

[8] *See* Docket # 165-1, *Statement of FHFA Director James B. Lockhart*, September 7, 2008 at 2 (noting that in light of housing market deterioration,

*Continued on next page.*

evidences its desire to advance a functioning secondary mortgage market

and increase the affordability of home ownership.  *See* 12 U.S.C. § 4501

("The Congress finds that . . . [the GSEs] have important public missions

that are reflected in the statutes and charter Acts establishing the Banks

and the enterprises").

---

the GSEs "have been unable to provide needed stability to the market" and
"to meet their affordable housing mission"); Docket # 165-2, *Statement of
Secretary Henry M. Paulson, Jr. on Treasury and Federal Housing Finance
Agency Action to Protect Financial Markets and Taxpayers*, Sept. 7, 2008 at 1
(preferred stock purchase agreements necessary to "avert and ultimately
address the systemic risk now posed by the scale and breadth of the
holdings of GSE debt and MBS"); *Mortgage Market Note 08-4, U.S. Treasury
Support for Fannie Mae and Freddie Mac* at 1, December 5, 2008, available at
http://www.fhfa.gov/PolicyProgramsResearch/Research/PaperDocuments/
20081205_MMNote_08-4_N508.pdf (measures taken by Treasury to
guarantee GSE securities are "intended to improve investor confidence in
the ability of each housing GSE to continue to provide liquidity to
mortgage markets and to meet its obligations" since "[i]nvestor confidence
is essential to liquid and well-functioning mortgage markets, which in turn
benefit homeowners and qualified mortgage borrowers by lowering
borrowing costs and supporting home prices") (last checked May 27, 2014);
*Fact Sheet: Treasury Senior Preferred Stock Purchase Agreement* at 1, Sept. 7,
2008, available at http://www.treasury.gov/press-center/press-
releases/Documents/pspa_factsheet_090708%20hp1128.pdf (noting that the
GSEs' debt and mortgage backed securities outstanding were about $5
trillion and "pose a systemic risk to our financial system") (last checked
May 27, 2014).

The totality of the circumstances surrounding the GSEs—the massive governmental outlays to them and that funding's stated purposes, in tandem with the statutory provisions permitting FHFA to become the GSEs conservator and the unique status of the GSEs as congressionally created private corporations—make clear that a sufficiently pleaded complaint could establish that the government-provided funds were being used by the GSEs to advance a governmental purpose or interest within the meaning of section 3729(b)(2)(A)(ii).

## C.     Government Provision Of "Any Portion Of The Money Or Property Which Is Requested Or Demanded"

Finally, the preferred stock purchase agreements between each GSE and Treasury highlight that a complaint could establish that the government was to provide or reimburse "any portion of the money or property which is requested or demanded" from a GSE.  31 U.S.C. § 3729(b)(2)(A)(ii).  As the plain language of the statute provides, where the government provides "*any* portion" of the demanded funds, there may be a "claim" under section 3729(b)(2)(A)(ii).  Congress' exclusion from the FCA's amended definition of "claim" of "requests or demands for money

26

or property that the Government has paid to an individual as compensation for Federal employment or as an income subsidy with no restrictions on that individual's use of the money or property," 31 U.S.C. § 3729(b)(2)(B), underscores the breadth of the types of claims Congress intended to be redressable under section 3729(b)(2)(A). This provision is the only specific exclusion from the definition of "claim," and suggests that Congress considered section 3729(b)(2)(A) broad enough to have plausibly included claims for monies paid as compensation or income subsidies. Courts' interpretation of the pre-FERA definition of "claim"—which included an identical requirement that the United States provide or reimburse "any portion of the money or property which is requested or demanded," *see* 31 U.S.C. § 3729(c) (2008)—similarly indicate the breadth of section 3729(b)(2)(A). *See United States ex rel. DRC, Inc.* v. *Custer Battles, LLC,* 562 F.3d 295, 303-305 (4th Cir. 2009) (concluding that demands made on a federal grantee, paid with a fund originally capitalized with federal and non-U.S. funds, were "claims" within the meaning of the FCA despite co-mingling since a "portion of [the payments] . . . was provided to the

27

grantee by the U.S. government"); *see also United States ex rel. Yesudian* v. *Howard University*, 153 F.3d 731, 738-39 (D.C. Cir. 1998) (indicating that where 80% of a university's funds were provided by the federal government, "the likelihood is high that the government would suffer . . . loss if Howard were to pay a false claim" and suggesting the relevance of the percentage of federal funds in a grantee's overall budget and the extent of continuing contact post-grant between a grantee and the government).

Here, the preferred stock purchase agreements between each GSE and Treasury underscore the connection between the GSEs' payment of fraudulent claims and governmental losses.  These agreements provide that GSEs can draw each quarter from Treasury their "deficiency amount"—*i.e.*, the "amount, if any, by which . . . the total liabilities of [the GSE] exceed . . . the total assets of Seller"—up to a specified limit.  *See, e.g.*, Amended and Restated Senior Preferred Stock Purchase Agreement at 2, 4 § 2.2, available at http://www.fhfa.gov/Conservatorship/Documents/Senior-Preferred-Stock-Agree/2008-9-26_SPSPA_FannieMae_RestatedAgreement_N508.pdf

(last checked May 27, 2014).[9]  Thus, every dollar added to the GSEs' bottom line by fraud is potentially passed along to the government, which is then contractually obligated to—and in fact repeatedly did—cover billions of the GSEs' net worth shortfall amounts between 2008 and 2012.  *See* GSE Draw Table at 2.

This funding arrangement highlights that a well-pleaded complaint could make out an FCA case based on claims made on the GSEs.  Where a plaintiff asserts liability based on claims made on an entity receiving federal funding, questions arise concerning whether "any portion" of a particular demand has been satisfied with that funding.  *See Garg* v. *Covanta Holding Corp.*, 478 F. App'x 736, 741 (3d Cir. 2012) (concluding that

---

[9] The limit to each GSE was originally $100 billion; it was raised to $200 billion in May 2009, and again per a formula based on deficiency amounts in another amendment in December 2009.  *See, e.g., Amendment to Amended and Restated Senior Preferred Stock Purchase Agreement*, May 6, 2009, available at http://www.fhfa.gov/Conservatorship/Documents/Senior-Preferred-Stock-Agree/2009-5-6_SPSPA_FannieMae_Amendment_508.pdf (last checked May 27, 2014); *Second Amendment to Amended and Restated Senior Preferred Stock Purchase Agreement*, Dec. 24, 2009, available at http://www.fhfa.gov/Conservatorship/Documents/Senior-Preferred-Stock-Agree/2009-12-24_SPSPA_FannieMae_Amendment2_508.pdf (last checked May 27, 2014).

"[t]he FCA requires more than fraud against anyone who happens to receive money from the federal government" and that "the specific money or property" at issue must meet the requirements of section 3729(b)(2)(A)(ii)).  Here, the level of government funding rose as needed to cover any difference between the GSEs' liabilities and the GSEs' assets. Given this funding arrangement, there is no question that a sufficiently pleaded complaint could establish that demands on the GSEs constitute a "claim" under the FCA.

## CONCLUSION

To the extent the Court finds it necessary to reach this issue, the

Court should hold that the GSEs are not categorically excluded from False

Claims Act liability under 31 U.S.C. § 3729(b)(2)(A)(ii).

Respectfully submitted,

STUART F. DELERY
  *Assistant Attorney General*

DANIEL G. BOGDEN
  *United States Attorney*

MICHAEL S. RAAB

  s/ Melissa N. Patterson

MELISSA N. PATTERSON
  *(202) 514-1201*
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7230*
  *U.S. Department of Justice*
  *950 Pennsylvania Ave., N.W.*
  *Washington, D.C.  20530*

MAY 2014

## CERTIFICATE OF COMPLIANCE WITH
## FEDERAL RULE OF APPELLATE PROCEDURE 32(A)

I hereby certify that this brief complies with the requirements of Fed.

R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Palatino

Linotype, a proportionally spaced font.

I further certify that this brief complies with the type-volume

limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 5,773 words,

excluding the parts of the brief exempted under Rule 32(a)(7)(B)(iii),

according to the count of Microsoft Word.


                                          s/ Melissa N. Patterson
                                          MELISSA N. PATTERSON

## CERTIFICATE OF SERVICE

I hereby certify that on May 27, 2014, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.  I further certify that I will cause paper copies of this brief to be filed with the Court upon receiving instructions to so file.

The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

s/ Melissa N. Patterson

MELISSA N. PATTERSON